**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 20-231** |
| **JOSEPH LAFORTE** | : | |

### GOVERNMENT'S MOTION FOR PRETRIAL DETENTION

The government, by and through its attorneys, William M. McSwain, United States

Attorney for the Eastern District of Pennsylvania, and Jonathan B. Ortiz and Patrick J. Murray,

Assistant United States Attorneys for the district, hereby submits this Motion For Pretrial

Detention to assist the Court in the Pretrial Hearing scheduled for August 11, 2020.

The government moves for pretrial detention because the defendant is both a danger to

the community and a flight risk.   In this case, the defendant possessed seven firearms and

multiple rounds of ammunition despite being a convicted felon.   As a result of his conduct in

this case, the defendant faces an advisory guideline range amounting to several years of

imprisonment.   Furthermore, this is not the defendant's first brush with the law.   The defendant

has prior convictions, including a conviction from the United States District Court for the

District of New Jersey, and from the New York State Supreme Court.   As detailed below, the

investigation of LaForte has also revealed that he has a history of making death threats to others,

and recently has said that he wants to move large sums of his money to off-shore bank accounts

and he is therefore a danger and flight risk.   Finally, the government's evidence in this case is

quite strong and includes, among other things, firearms recovered from the defendant's home in

numerous places and recorded admissions by the defendant that he possesses and uses firearms.

Because no condition or combination of conditions will reasonably assure the defendant's appearance as required and the safety of the community, the government moves pursuant to 18 U.S.C. §§ 3142(e) and (f) for a detention hearing.

I.      **FACTS**

In support of this motion, the government makes the following representations and proposed findings of facts:

A.      **Probable Cause and The Evidence in this Case**

On August 5, 2020, a grand jury returned an indictment charging the defendant with the possession of seven firearms and multiple rounds of ammunition by a convicted felon.   As such, there is probable cause to believe that the defendant has violated Title 18, United States Code, Section 922(g)(1).   The evidence in this case is straightforward and strong, and therefore the likelihood of conviction is great.

This case is a result of a long-term, ongoing, criminal investigation of Joseph LaForte and his business by the FBI, the IRS, and the FDIC.   LaForte and his company are not currently facing any charges relating to the investigation.   However, as a result of the investigation, the FBI sought several federal search warrants related to LaForte.   On July 23, 2020, Judge Linda Caracappa (USMJ-EDPA) authorized search warrants for locations related to the business and for 568 Ferndale Lane, Haverford (the primary residence of LaForte and his wife).   On July 27, 2020, Judge Bruce Reinhart (USMJ – SDFL) authorized search warrants for a second office for the business, and for 107 Quayside Drive, Jupiter, Florida (a vacation home of LaForte). These warrants authorized the seizure of a number of classes of documents and records relating to the investigation.

On July 24, 2020, Judge Karoline Mehalchick (USMJ-MDPA) also authorized a search warrant for 105 Rebecca Court, Paupack, PA (another vacation home of LaForte).   The search warrant was justified, in part, by a recording made a mere two days earlier in the investigation, on July 22, 2020, when two FBI Undercover Employees (UCE 1 and UCE 2) participated in a meeting with LaForte and one of LaForte's business partners. During the recorded meeting, LaForte discussed owning a home on Lake Wallenpaupack and encouraged the UCEs to come to his residence to shoot firearms.   Specifically, the following exchange occurred:

> LAFORTE: **You know what.   I've got… I've got rifles**.
>
> UCE 2: We'd be shooting people that live on the lake, probably.
>
> LAFORTE: **You know what I'm saying.   (inaudible)   You've got rifles.   I've got rifles.**
>
> . . . .
>
> LAFORTE: **I've got AR-15s, what do you want bro, come on.**
>
> UCE 1: AR-15s (laughing)
>
> UCE 2: Kill everybody.
>
> UCE 1: I'd love to shoot one of those…
>
> LAFORTE: And my dogs…..
>
> UCE 1: Do you have like a lot of cool guns to shoot?   Yea, yea? (inaudible)
>
> . . . .
>
> LAFORTE: **We've got everything, AR-15s.   We've got, uh, sawed off shotguns, rifles.   We've got, I don't know, what do you want?**
>
> UCE 1: Are they all at the lake? (inaudible)

. . . .

LAFORTE: **We've got gun rooms up there. Yea. (inaudible**)

On July 28, 2020, agents simultaneously executed all of the search warrants.   At approximately 10:33 a.m. agents entered onto LaForte's Haverford property.   After approach, LaForte's wife informed the agents that there were 4 firearms in the residence, including an "AR-15 under the bed," "handguns in each drawer by the bed," and one "gun in the first floor office" which she claimed was her office.   However, upon searching the residence, agents recovered 7 guns in total (not 4, as she claimed existed), including two from the office (not 1, as she claimed they would find).   Moreover, one of the guns from the office was recovered from within a locked drawer that housed Joe LaForte's personal journal.

On the second floor of the residence agents entered the master bedroom.   In a nightstand, agents observed a Smith & Wesson M&P Bodyguard 380 handgun, loaded with 5 rounds, and a Smith & Wesson EZ Shield 380 handgun, loaded with 8 rounds, and which also had a separate 8 round magazine within the drawer.   Underneath the bed agents observed a black gun case which was later revealed to hold a Smith & Wesson M&P 15 rifle, loaded with 30 rounds of 556 ammunition.

Agents also observed two shotguns that were within cases in a basement storage area - a Beretta ES100 shotgun and a Beretta AL392 Urika shotgun.

After observing the firearms and several bunches of large sums of currency (later determined to be approximately $592,847) in the residence, agents sought and obtained a follow-

4

up search warrant for the premises to seize the currency and any and all firearms.[1]   Judge

Elizabeth T. Hey (USMJ-EDPA) authorized the follow-up warrant.   After the warrant was

authorized the agents concluded the search and vacated the premises.

Experts are available to testify at trial the seized firearms are, in fact, firearms and that

the seized firearms all travelled in and affected interstate and/or foreign commerce prior to their

seizure from LaForte's residence.

### B.   <u>Maximum and Mandatory Minimum Penalty</u>

The total maximum penalty the defendant faces is: a maximum sentence of ten years of

imprisonment, a $250,000 fine, 3 years of supervised release, and a $100 special assessment.

### C.   <u>Criminal History</u>

Prior to July 28, 2020, Joeseph LaForte had previously been convicted of felony offenses.

First in 2004, LaForte was convicted of money laundering, grand larceny, conspiracy, and

related offenses in Nassau County, New York.   LaForte was sentenced to 3 1/2 to 10 1/2 years

in prison and was obligated to pay a $14 million dollar restitution.   It is believed that the

restitution remains outstanding and unsatisfied.

Second, in 2010, LaForte was sentenced in the United States District Court for the

District of New Jersey for a conviction for conspiracy to operate an illegal gambling business in

violation of 18 U.S.C. § 371 (conspiracy), a felony. He was sentenced to 10 months incarceration

---

1 Large sums of money were also approved for seizure from the other search locations.   From
the vacation home in the Middle District of Pennsylvania, agents recovered approximately
$1,275,865.   From the vacation home in the Southern District of Florida, agents recovered
approximately $596,733.   In total the FBI recovered approximately $2,532,885 from LaForte's
properties and business.

followed by three years supervised release.   LaForte's federal judgment order states that he "shall not possess a firearm or destructive device."

## II.   <u>Legal Basis for Detention</u>

The defendant has demonstrated by his participation in the charged conduct and his history that he should not be released from custody.   Congress made this point very clearly when, for a crime such as being a felon in possession of a firearm, it codified a statutory justification for pretrial release to assure the safety of the community and/or the presence of the defendant.

The passage of the Bail Reform Act of 1984 marked a departure from previous bail laws because Congress provided for pretrial detention regardless of whether that defendant poses a risk of flight, if the court determines by clear and convincing evidence that "no condition or combination of conditions will reasonably assure...the safety of any other person and the community." 18 U.S.C. §§ 3142(e) and (f).   The Act itself "was a legislative response to growing public concern over increased crime and the perceived connection between crime and defendants released on bail." <u>United States v. Orta</u>, 760 F.2d 887, 890 (8th Cir. 1985).   It "reflect[ed] the Committee's determination that Federal bail laws must address the alarming problem of crimes committed by persons on release and must give the courts adequate authority to make release decisions that give appropriate recognition to the danger a person may pose to others if released. The adoption of these changes marks a significant departure from the basic philosophy of the [prior bail act], which is that the sole purpose of bail laws must be to assure the appearance of the defendant at judicial proceedings." <u>Id.</u> citing S. Rep. No. 225, 98th Cong., 1st Sess. 3, reprinted in 1984 U.S. Code Cong. & Ad. News 3182, 3185-3186.

A primary purpose of the Bail Reform Act, therefore, was to allow courts to assess the potential dangerousness of the defendants appearing before them.   For this reason, Congress, in passing the Act, "recognized that 'there is a small but identifiable group of particularly dangerous [persons] as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community or other persons. It is with respect to this limited group...that the courts must be given the power to deny release pending trial." S. Rep. No. 225, 98th Cong., 1st Sess., 6-7 (1983).

It is difficult to imagine a better delineation of a "small but identifiable group" of potentially dangerous individuals for whom "stringent release conditions" will not assure safety than convicted felons who, with contempt for the law unequivocally barring it, possess firearms. See United States v. Chappelle, 51 F.Supp.2d 703, 704 (E.D. Va. 1999)("the history of the firearm laws reveals the strong congressional conviction that an armed felon poses a substantial threat to all members of society.")(internal quotations and citations omitted); Sloan, 820 F. Supp. at 1138 ("felons in possession of firearms are a threat to the safety of society."); United States v. Doe, 960 F.2d 221, 225 (1st Cir. 1992)("legislators, when enacting the felon-in-possession statute, repeatedly referred to the danger that a gun, in the hands of a previously convicted felon, poses for the public."). It is therefore appropriate, and consistent with the broader legislative intent, that 18 U.S.C. § 3142 be read with sufficient breadth to encompass the substantial risk that Congress believed is created when felons possess firearms.

Furthermore, the possession of a firearm by a convicted felon is generally a continuing act, and therefore creates a continuing risk of harm. See United States v. Jones, 651 F.Supp. 1309, 1310 (E.D. Mich. 1987)("The illegal possession of a firearm is frequently a continuing act,

so such risk that it entails is a continuing risk. The character of the crime cannot be measured

solely as of the moment of discovery and arrest.").   Illegal firearms possession is an ongoing

offense that often is not ended voluntarily, but only through law enforcement intervention.

Unlike a theft or robbery that occurs at a specific moment in time, the ongoing nature of the

felon in possession offense means that prediction of the "risks" associated with the Defendant's

possession of firearms are based on the felon's past conduct as a predictor of future acts and the

lethal potential of Defendant's possession of firearms.   A convicted felon is barred from

possessing a firearm precisely because there is an ongoing risk that he will use the weapon.

Since a convicted felon can never use the firearm legally, the possession creates the constant,

present threat that illegal use will occur.

      A felon, therefore, who possesses a firearm in violation of this ban commits a continuing

threat against society and has demonstrated the inability of specific legal proscriptions to prevent

him from breaking the law. See e.g. Chappelle, 51 F.Supp.2d at 704 ("felons who possess

firearms presumably do so with the knowledge that they cannot, that their previous criminal

history makes them more likely to use that weapon, and that they possessed the weapon to begin

with in contemplation of using it at some point.").

      The legislative history of Title VII of the Omnibus Crime Control and Safe Streets Act of

1968, which included the predecessor to section 922(g), also supports a finding of

dangerousness.   As the district court in United States v. Phillips, 732 F.Supp. 255, 263 (D.

Mass. 1990) noted:

> Congress prohibited the possession of firearms by felons because it
> believed that possession of a firearm is particularly dangerous when
> it is by a convicted felon. As Senator Long stated, felons, among

others, "have demonstrated that they are dangerous, or that they may become dangerous. Stated simply, they may not be trusted to possess a firearm without becoming a threat to society.[2]
732 F. Supp. at 262-263.

### A.     Likelihood of Flight

While the defendant has community ties, which often benefit a defendant's chance for pretrial release, here these ties are troubling as they relate to Mr. LaForte's potential release plan. The defendant's relationships with his family members, friends, and his consistent employment have not stopped him from engaging in crime.   Indeed his family, friends and employment are the means through which he has engaged in criminal conduct, since as early as 2012, when he opened his business.   The defendant remains the subject of an ongoing criminal investigation led by the FBI, and he and his company are the subjects of a separate civil lawsuit brought by the United States Securities and Exchange Commission (SEC).   The defendant, as alleged in public filings in the SEC matter, engaged in a number of frauds in order to obtain large sums of money through his company.   The SEC matter also alleges that LaForte used aliases when conducting his business and failed to disclose to business investors and clients that he was a convicted felon. The extent of his wrongdoing through his business has already resulted in a temporary restraining order, seizure by the SEC of millions of dollars of likely ill-gotten monies, and the complete loss of control over his own business through a court appointed receiver. This means that for the past several years, while attempting to appear as an honest business person, the defendant was engaged in a variety of forms of conduct, many of which are now being revealed,

---

[2]  Remarks of Senator Long, quoted in United States v. Bass, 404 U.S. 336, 354-355 (1971) (Blackmun, J., dissenting) (quoting from 114 Cong. Rec. 14,773-14,774 (1968)).

that have drastically altered the analysis of who Joe LaForte is.   The SEC filing thus far shows that LaForte uses aliases, lies to others, misrepresents who he is and what his business is engaged in, and alters and manipulates his business records as a means to fraudulently obtain monies. This court therefore cannot rely upon any representation from LaForte about his alleged trustworthiness, community ties, or employment as a basis for a release plan.   Consequently, no condition or combination of conditions can assure this court that he will not flee.

Also, the criminal investigation, and the separate SEC investigation, has resulted in the seizure of millions of dollars and substantial assets from the defendant.   The defendant, who had been used to a lifestyle of having several homes, multiple expensive cars, vast sums of money, a private jet and near limitless resources, now is a person facing not only loss of that entire lifestyle but of near certain conviction for an offense that will result in incarceration.   The defendant has a significant motivation therefore to flee if released as he knows that he stands to lose everything he believed he had prior to the search of his home.   Additionally, despite the significant seizures from LaForte mentioned above, the government is aware that the defendant has been attempting for some time to move his monies to off-shore bank accounts to avoid detection from authorities.   In connection with that effort, the defendant had several conversations with individuals, who unbeknownst to him were FBI Undercover Employees, about using his personal jet (which was recently seized by the government) to fly bulk currency to Nevis in order to obtain citizenship and place his monies into secret bank accounts. Unfortunately, the government does not yet know if he succeeded in those efforts of hiding his riches.   However, any representation made by LaForte that he has no means to flee the jurisdiction if released must be met with great scrutiny by the court.   His prior statements about

trying to hide his assets should speak volumes to the court about his motivation and intent to flee if he is released.

　　This means that his ties to family, friends, employment and the community do nothing to ensure this Court that if released he will suddenly become a law abiding resident and will not flee.   LaForte used his family ties and employment to commit fraud and wrongdoing, as evidenced by the SEC's public filings.   Similarly, those ties – his family, his friends, his assets, and his employment – did nothing to prevent him from possessing seven firearms and numerous rounds of ammunition.   His family and friends didn't prevent his crime here.   And the potential loss of assets and risk of re-incarceration didn't prevent his crime here.   Any argument that he will not flee or cause harm because of his family, his assets and employment ties are betrayed by the facts of this case.   LaForte had 2 loaded guns in his office desk, 2 loaded guns in his nightstand, 1 loaded gun beneath his bed, and 2 guns in the basement of his home despite (1) being a felon, (2) sharing his home with his wife, (3) having substantial assets, and (4) steady lucrative employment.   Those same connections cannot be a basis for releasing him now as they all failed him before.

> **B.** **Dangerousness**

　　Joseph LaForte is charged with being a felon in possession of a firearm, which is one important factor to consider in determining his dangerousness to the community.   However, equally probative of his dangerousness to the community is the fact that the Defendant has an extensive history of criminal activity and has shown, though the undercover recording described above, his willingness to not only possess firearms, but to transport them to other judicial district, brag about his stockpile of guns, and encourage their use. See also United States v. Aiken, 775 F.

Supp. 855, 865 (D. Md. 1991)(a criminally-inclined individual is more likely to use a firearm already in his possession to commit a crime); United States v. Connolly, 1999 WL 1995186 at *9 (D. Conn. 1999)(detaining defendant charged with felon in possession finding, *inter alia*, it "is evident that the defendant is unwilling and/or unable to comply with the laws that forbid his possession of firearms, that he lacks respect for authority and that he acts recklessly and impulsively."). See generally United States v. Randolph, 205 F.3d 1342, 2000 WL 92263 (6th Cir. 2000)(detaining defendant who was indicted on the charge of felon in possession); United States v. Spry, 76 F.Supp.2d 719, 721 (S.D. W.Va. 1999)(recognizing, in a felon in possession case, that "there are a number of significant practical, if not legal, distinctions between noticing a crime of violence at the pretrial versus the sentencing stages of a criminal case."). Accord United States v. Chappelle, 51 F.Supp.2d 703 (E.D. Va. 1999)(detaining defendant charged with felon in possession). LaForte's brazen statements to the Undercovers, as well as his apparent prior practice of keeping guns littered throughout his home, clearly show his unwillingness to follow court imposed restrictions, lead a law abiding life, and refrain from possessing and using firearms.   LaForte by his words and actions has revealed that he is a danger to the community.

Additionally troubling is the government's knowledge that in connection with his business LaForte at times resorted to threats of violence in order to do business.   In connection with efforts to collect upon debts owed the company, witnesses have revealed to the government that LaForte threatened to "blow your house up" to one merchant.   LaForte threatened another merchant by asking if she "ever heard of cement shoes" and then later saying that one day she would start her car engine and "poof," if she didn't pay LaForte.   Another merchant told the FBI that LaForte threatened to take all of the merchant's assets for his failure to make a loan payment

12

and then said to the merchant, "Try to fucking stop me. I'll have you and your son killed." Similarly, numerous witnesses have told the FBI that after entering into an agreement with LaForte, and missing a payment, a large muscular man appeared uninvited at their place of business, threatened them with physical harm, and demanded money for LaForte and his company.   Although the government is unaware of the threats being carried through to fruition, the fact that LaForte, and people appearing to act on his behalf, engaged in such threatening behavior shows that LaForte is a person capable of much danger to the community if released.

Therefore, taking a complete view of the defendant, his case, his history, and his community ties, Joseph LaForte cannot overcome the reality that he must be detained pending trial.

III.   **CONCLUSION**

When all these factors are viewed in light of the substantial sentence the defendant faces if convicted, it is clear that no condition or combination of conditions will reasonably assure the presence of the defendant as required and/or the safety of the community.

WHEREFORE, the government respectfully submits that its Motion for Defendant's Pretrial Detention should be granted.

Respectfully submitted,

WILLIAM M. MCSWAIN
United States Attorney

 /s   Jonathan B. Ortiz_____
JONATHAN B. ORTIZ
Assistant United States Attorney

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | **CRIMINAL NO. 20-231** |
| JOSEPH LAFORTE | : | |

**<u>PRETRIAL DETENTION ORDER</u>**

AND NOW, this            day of August, 2020, after an evidentiary hearing and argument of counsel for the government and the defendant, the Court finds that this case is appropriate for detention under Title 18, United States Code, Section 3142(e) and 3142 (f)(1)(A) because:

      1.    the government has proved by a preponderance of the evidence that no condition or combination of conditions will reasonably assure the appearance of the defendant as required; and

      2.    the government has proved by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of other persons and the community, as required by Title 18, United States Code, Section 3142(e).

The Court makes the following findings of fact:

      1.    There is probable cause to believe that the defendant has violated Title 18, United States Code, Section 922(g)(1).

      2.    The evidence in this case is strong, and the likelihood of conviction is great.

      a.    On August 5, 2020, a grand jury returned an indictment charging the defendant

with the possession of seven firearms and multiple rounds of ammunition by a convicted felon.   As such, there is probable cause to believe that the defendant has violated Title 18, United States Code, Section 922(g)(1).   The evidence in this case is straightforward and strong, and therefore the likelihood of conviction is great.

b.        This case is a result of a long-term, ongoing, criminal investigation of Joseph LaForte and his business by the FBI, the IRS, and the FDIC.   LaForte and his company are not currently facing any charges relating to the investigation.   However, as a result of the investigation, the FBI sought several federal search warrants related to LaForte.   On July 23, 2020, Judge Linda Caracappa (USMJ-EDPA) authorized search warrants for locations related to the business and for 568 Ferndale Lane, Haverford (the primary residence of LaForte and his wife).   On July 27, 2020, Judge Bruce Reinhart (USMJ – SDFL) authorized search warrants for a second office for the business, and for 107 Quayside Drive, Jupiter, Florida (a vacation home of LaForte). These warrants authorized the seizure of a number of classes of documents and records relating to the investigation.

c.        On July 24, 2020, Judge Karoline Mehalchick (USMJ-MDPA) also authorized a search warrant for 105 Rebecca Court, Paupack, PA (another vacation home of LaForte). The search warrant was justified, in part, by a recording made a mere two days earlier in the investigation, on July 22, 2020, when two FBI Undercover Employees (UCE 1 and UCE 2) participated in a meeting with LaForte and one of LaForte's business partners. During the recorded meeting, LaForte discussed owning a home on Lake Wallenpaupack and encouraged the UCEs to come to his residence to shoot firearms.   Specifically, the following exchange occurred:

2

LAFORTE: **You know what.   I've got… I've got rifles**.

UCE 2: We'd be shooting people that live on the lake, probably.

LAFORTE: **You know what I'm saying.   (IA)   You've got rifles.   I've got rifles.**

. . . .

LAFORTE: **I've got AR-15s, what do you want bro, come on.**

UCE 1: AR-15s (laughing)

UCE 2: Kill everybody.

UCE 1: I'd love to shoot one of those…

LAFORTE: And my dogs…..

UCE 1: Do you have like a lot of cool guns to shoot?   Yea, yea? (IA)

. . . .

LAFORTE: **We've got everything, AR-15s.   We've got, uh, sawed off shotguns, rifles.   We've got, I don't know, what do you want?**

UCE 1: Are they all at the lake? (IA)

. . . .

LAFORTE: **We've got gun rooms up there. Yea. (IA)**

d.        On July 28, 2020, agents simultaneously executed all of the search warrants.   At approximately 10:33 a.m. agents entered onto LaForte's Haverford property.   After approach, LaForte's wife informed the agents that there were 4 firearms in the residence, including an "AR-15 under the bed," "handguns in each drawer by the bed," and one "gun in the first floor office" which she claimed was her office.   However, upon searching the residence, agents recovered 7 guns in total (not 4, as she claimed existed), including two from the office (not 1, as she claimed they would find).   Moreover, one of

3

the guns from the office was recovered from within a locked drawer that housed Joe

LaForte's personal journal.

e.        On the second floor of the residence agents entered the master bedroom.   In a

nightstand, agents observed a Smith & Wesson M&P Bodyguard 380 handgun, loaded

with 5 rounds, and a Smith & Wesson EZ Shield 380 handgun, loaded with 8 rounds, and

which also had a separate 8 round magazine within the drawer.   Underneath the bed

agents observed a black gun case which was later revealed to hold a Smith & Wesson

M&P 15 rifle, loaded with 30 rounds of 556 ammunition.

f.        Agents also observed two shotguns that were within cases in a basement storage

area - a Beretta ES100 shotgun and a Beretta AL392 Urika shotgun.

g.        After observing the firearms and several bunches of large sums of currency in the

residence, agents sought and obtained a follow-up search warrant for the premises to

seize the currency and any and all firearms.   Judge Elizabeth T. Hey (USMJ-EDPA)

authorized the follow-up warrant.   After the warrant was authorized the agents

concluded the search and vacated the premises.

h.        Experts are available to testify at trial the seized firearms are, in fact, firearms and

that the seized firearms all travelled in and affected interstate and/or foreign commerce

prior to their seizure from LaForte's residence.

        3.        The total maximum penalty the defendant faces is: a maximum sentence

of ten years of imprisonment, a $250,000 fine, 3 years of supervised release, and a $100

special assessment.

        4.        The strength and nature of the case against the defendant, including the

4

defendant's possession of a firearm, despite his status as a convicted felon, the defendant's lack of employment, and the strong likelihood that the defendant will be incarcerated for a significant period of time, establishes the defendant's danger to the community and increases the high risk that the defendant will not appear as required by the Court.

Therefore, IT IS ORDERED that the defendant be committed to the custody of the Attorney General for confinement in a correction facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal; that the defendant be afforded reasonable opportunity for private consultation with counsel; and that, on order of a Court of the United States, or on request of an attorney for the government, the person in charge of the corrections facility in which the defendant is confined deliver the defendant to a United States Marshal for the purpose of an appearance in connection with a court proceeding.

BY THE COURT:

_____
HONORABLE MARILYN HEFFLEY
*United States Magistrate Judge*

5

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the Government's Motion for Pretrial

Detention, and Proposed Order, was served by electronic mail upon:

> Michael J. Engle, Esquire
> Buchanan Ingersoll & Rooney PC
> Two Liberty Place
> 50 S. 16th Street, Suite 3200
> Philadelphia, PA 19102-2555

> /s Jonathan B. Ortiz
> JONATHAN B. ORTIZ
> Assistant United States Attorney

Dated: August 11, 2020