# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 20-231 |
| JOSEPH LAFORTE | : | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR PRETRIAL RELEASE**

The government, by and through its attorneys, William M. McSwain, United States Attorney for the Eastern District of Pennsylvania, and Jonathan B. Ortiz and Patrick J. Murray, Assistant United States Attorneys for the district, hereby submits this Response in Opposition to the Defendant's Motion For Pretrial Release. For the reasons stated below, the defendant's motion for release should be denied and he should remain detained pending trial.

**I.      Background of the Case and Procedural History.**

This case is a result of a long-term, ongoing, criminal investigation of Joseph LaForte and his business by the FBI, the IRS, and the FDIC. LaForte and his company are not currently facing any charges relating to the investigation. However, as a result of the investigation, the FBI sought several federal search warrants related to LaForte. On July 23, 2020, Judge Linda Caracappa (USMJ-EDPA) authorized search warrants for locations related to the business and for 568 Ferndale Lane, Haverford (the primary residence of LaForte and his wife). On July 27, 2020, Judge Bruce Reinhart (USMJ – SDFL) authorized search warrants for a second office for the business, and for 107 Quayside Drive, Jupiter, Florida (a vacation home of LaForte). These warrants authorized the seizure of a number of classes of documents and records relating to the investigation.

On July 24, 2020, Judge Karoline Mehalchick (USMJ-MDPA) also authorized a search warrant for 105 Rebecca Court, Paupack, PA (another vacation home of LaForte). The search warrant was justified, in part, by a recording made a mere two days earlier in the investigation, on July 22, 2020, when two FBI Undercover Employees (UCE 1 and UCE 2) participated in a meeting with LaForte and one of LaForte's business partners. During the recorded meeting, LaForte discussed owning a home on Lake Wallenpaupack and encouraged the UCEs to come to his residence to shoot firearms. Specifically, the following exchange occurred:

> LAFORTE: **You know what. I've got… I've got rifles**.
>
> UCE 2: We'd be shooting people that live on the lake, probably.
>
> LAFORTE: **You know what I'm saying. (inaudible) You've got rifles. I've got rifles.**
>
> . . . .
>
> LAFORTE: **I've got AR-15s, what do you want bro, come on.**
>
> UCE 1: AR-15s (laughing)
>
> UCE 2: Kill everybody.
>
> UCE 1: I'd love to shoot one of those…
>
> LAFORTE: And my dogs…..
>
> UCE 1: Do you have like a lot of cool guns to shoot? Yea, yea? (inaudible)
>
> . . . .
>
> LAFORTE: **We've got everything, AR-15s. We've got, uh, sawed off shotguns, rifles. We've got, I don't know, what do you want?**
>
> UCE 1: Are they all at the lake? (inaudible)
>
> . . . .

LAFORTE: **We've got gun rooms up there. Yea. (inaudible**)

On July 28, 2020, agents simultaneously executed all of the search warrants. At approximately 10:33 a.m. agents entered onto LaForte's Haverford property. After approach, LaForte's wife informed the agents that there were 4 firearms in the residence, including an "AR-15 under the bed," "handguns in each drawer by the bed," and one "gun in the first floor office" which she claimed was her office. However, upon searching the residence, agents recovered 7 guns in total (not 4, as she claimed existed), including two from the office (not 1, as she claimed they would find). Moreover, one of the guns from the office was recovered from within a locked drawer that housed Joe LaForte's personal journal.

On the second floor of the residence, agents entered the master bedroom. In an unlocked nightstand, agents observed a Smith & Wesson M&P Bodyguard 380 handgun, loaded with 5 rounds, and a Smith & Wesson EZ Shield 380 handgun, loaded with 8 rounds, and which also had a separate 8 round magazine within the drawer. Underneath the bed agents observed a black gun case which was later revealed to hold a Smith & Wesson M&P 15 rifle, loaded with 30 rounds of 556 ammunition.

Agents also observed two shotguns that were within cases in a basement storage area - a Beretta ES100 shotgun and a Beretta AL392 Urika shotgun.

After observing the firearms and several collections of large sums of currency (later determined to be approximately $592,847) in the residence, agents sought and obtained a follow-up search warrant for the premises to seize the currency and any and all firearms.[1] Judge

---

[1] Large sums of money were also approved for seizure from the other search locations. From the vacation home in the Middle District of Pennsylvania, agents recovered approximately

Elizabeth T. Hey (USMJ-EDPA) authorized the follow-up warrant. After the warrant was authorized, the agents concluded the search and vacated the premises.

On August 5, 2020, a grand jury returned an indictment charging the defendant with the possession of seven firearms and multiple rounds of ammunition by a convicted felon.

On August 11, 2020, after reviewing the parties' submissions and arguments, the Honorable Marilyn Heffley found LaForte to be a risk of flight and a danger to the community and ordered him detained pending trial.

On August 25, 2020, LaForte submitted a motion to this Court seeking pretrial release. Defendant's motion claims that (1) the government misrepresented the contents of a recording between LaForte and two Undercover Agents, (2) LaForte has not made credible threats against others, and (3) LaForte is not a violent danger to the community. The government responds as follows.

## II. LaForte's Recorded Statements About Moving Money to Offshore Accounts.

As noted in the government's previous detention motion (attached as Exhibit A) and argument, LaForte is a risk of flight if released because, among other reasons, he has expressed a desire to move large sums of money to offshore bank accounts. As a result, any indication now that he will not flee must be met with great scrutiny and caution. On July 22, 2020, LaForte and one of his business partners (PERSON 1) engaged in a lengthy conversation with two FBI Undercover Agents posing as potential investors. During the conversation, the following

---

$1,275,865 in cash. From the vacation home in the Southern District of Florida, agents recovered approximately $596,733 in cash. In total the FBI recovered approximately $2,532,885 from LaForte's properties and business.

exchange occurred:

> PERSON 1: So what's in the Caribbean guys?
>
> UCE 1: Nevis.
>
> UCE 2: Nevis, specifically. Is uh, a great place to put money.
>
> PERSON 1: Yeah it is. You a fly fishing?
>
> UCE 2: A great place to put money I'm . . .
>
> **LAFORTE: When we going?**
>
> …
>
> **LAFORTE: I'm in by the way.   Let's go.**
>
> UCE 2: And you get citizenship there when you buy a place over a certain amount of money. You get citizenship.
>
> UCE 1: You get citizenship.
>
> **LAFORTE: I know. I know about this. I know about this**.
>
> UCE 2: You get citizenship and it gets you so much.
>
> **LAFORTE: But you gotta spend**.
>
> UCE 1: But you can get a scam condo there for 300 grand.
>
> **LAFORTE: Yeah, but you want to go bigger because you want to get nexus.**
>
> UCE 1: Well, yeah. Well.
>
> …
>
> **LAFORTE: When are we flying down to Nevis?**
>
> UCE 1: When would you like to?
>
> …

**LAFORTE: Well if we go down to and buy a place, how fast can we get in front of a bank?**

UCE 1: That day.

UCE 2: That day.

UCE 1: Seriously.

**LAFORTE: Okay.**

…

**LAFORTE: And they accept cash there?**

UCE 1: Absolutely.

PERSON 1: Yeah, he brought cash, my buddy.

UCE 1: So here's what you do.

UCE 2: The beauty of a private plane. You take a plane. No checked bags.

**LAFORTE: Oh yeah**.

UCE 1: Bring bags.

**LAFORTE: Oh yeah.**

As the interaction above demonstrates, LaForte demonstrated a desire to learn more about, and actually travel to, Nevis in order to move bulk currency into offshore accounts after obtaining citizenship. After being told that Nevis is a good place to stash money, LaForte stated, "When are we going?" After being told that he can get citizenship in Nevis if he purchases property, LaForte stated, "yeah, but you want to go bigger because you want to get nexus" and then added, "when are we flying down to Nevis?" LaForte then followed up the conversation by asking, "Well, if we go down to and buy a place, how fast can we get in front of

a bank?" LaForte was then told that he could see a bank the day he arrives in Nevis and buys a property, so he asked, "and they accept cash there?" After being told that, yes, he can bring cash on a private plane (which at the time LaForte had owned) and avoid customs inspections, LaForte stated, simply, "oh yeah." Clearly, a plain reading of the conversation shows that LaForte had a genuine interest in, desire to, and plan to, move bulk amounts of money to Nevis. Inexplicably, however, LaForte is bold enough to claim that the government had given a "misleading characterization"[2] of the recording to Judge Heffley. Unfortunately for LaForte, the conversation is a clear indication of his great interest in Nevis as he asks several questions about the possibility and feasibility of using his own private jet to fly bulk amounts of currency to Nevis where he could obtain citizenship and use the banking system – which is what the government represented to Judge Heffley in the detention hearing.

The representation made by LaForte that he has no means to flee, or no desire to flee, if released must be examined with great scrutiny by the Court. His prior statements about trying to hide his assets should speak volumes about his motivation and intent to flee if he is released. This means that his ties to family, friends, employment and the community should do nothing to ensure this Court that if released he will suddenly become a law abiding resident and will not flee.

---

[2] Unfortunately, LaForte's motion makes clear that instead of the government mischaracterizing the conversation, he is actually the one that mischaracterizes it. So that the Court is aware, the government provided the recording and transcript to LaForte's counsel on August 18, 2020. Yet, after having a full week to review it, LaForte chose to provide this Court with one small portion of the conversation which conspicuously omitted any of the damaging statements LaForte made about his thoughts and intentions. See Def.'s Mot. at 6-7. Whether the defendant did this as an attempt to malign the government's credibility and representations, or to simply misrepresent the nature of the recording to the Court, the defendant's motion is inaccurate.

**III.     LaForte Used Threats and Intimidation as Part of His Business Practice.**

As noted in its detention motion and argument, LaForte used threats and intimidation as means to collect money from his business's clients.   He has therefore demonstrated his dangerousness and now those acts should point this Court towards detention.   Multiple witnesses have informed the FBI that LaForte and people acting on his behalf made a number of threats of physical harm for failing to pay LaForte money.   As a result, LaForte is a danger to the community because he has engaged in dangerous activities in his recent past and now is in a much more dire circumstance, facing years in prison.   Witnesses have told the FBI that LaForte threatened to kill them or family members, threatened to blow up their houses and car, and ominously referred to "cement shoes" as a means to threaten or harm his debtors.   These prior statements, and the potential availability of these witnesses in a separate proceeding, should indicate to the Court that LaForte, a felon found to be in possession of multiple guns, is a danger to the community.

Unfortunately, when made aware that the government knew of, and spoke with, such witnesses, LaForte resorted to a wholly irrelevant and salacious slander on a person with no connection to this case.   LaForte notes, in footnote 9 of his motion, that in connection with an unrelated civil suit LaForte investigated his opposing civil counsel and found alleged inappropriate activities by that lawyer.   From there, apparently he seeks to imply that any person who was, or is, a witness against him must be untrustworthy.   LaForte then has the gall to try to bring this irrelevant and inflammatory information into this case when it has absolutely nothing to do with whether LaForte is a flight risk, a danger to the community, or was a felon in possession of firearms.   The government refuses to engage in any speculation on the validity of

8

LaForte's claim about the civil lawyer as it is an entirely baseless argument to make to this Court. It is plainly offensive to the professional practice before this Court. A character attack on a person who cannot defend themselves about a wholly irrelevant allegation, serves absolutely no legitimate purpose whatsoever. Ironically, however, LaForte's willingness to resort to such depths of argument and outrageous characterizations shows his willingness to put his own interests above all others. In an odd way, LaForte's scorched earth argument for release should show this Court that he cannot be trusted because he will, apparently, resort to any argument he can think of in order to be released.

**IV. LaForte Was in Possession of Firearms – a Dangerous and Illegal Act.**

LaForte claims that he should be released because the presence of firearms in his home was not a dangerous or violent act. This argument is not only incorrect but also misses the point of the detention analysis entirely. Detention determinations are specific inquiries into a particular defendant's ability to be trusted with release. As was demonstrated by the government in the prior detention hearing, LaForte is facing near certain conviction for being a felon in possession of a firearm with a likely lengthy prison sentence to follow. He also recently suffered a loss of his business and significant assets and has previously indicated a desire to relocate to a foreign country and a willingness to harm people. The reality of his present circumstance and history shows that he needs to be detained pending trial.

The government admits, as it did in its detention argument, that LaForte is not alleged to have used the firearms against another person. He is alleged to have possessed them, which as a twice-convicted felon, is and of itself a crime. LaForte claims, incorrectly, that the government argued that his case was a crime of violence. The government made no such argument and

indeed stated to Judge Heffley that there is "an issue where there are armed felons posing a safety threat to the community. We're not suggesting that this is a case that's a crime of violence. . . ." *See* Exhibit B (Transcript of August 11, 2020, Detention Hearing) at 5. While LaForte takes issue with cases cited in the government's detention motion, all of the cases acknowledge that a felon in possession of a firearm may be detained. Contrary to LaForte's motion, which again engages in mischaracterizations, the government never claimed LaForte used the guns against another person or that he is charged with an inherently violent crime. Instead, the government articulated several characteristics, specifically about LaForte, that show he is a danger, a flight risk, and is likely to be convicted. The government also demonstrated how he, particularly in possession of firearms, is a danger to the community which counsels towards continued detention.

Unfortunately, once again, LaForte also makes other irrelevant and inaccurate arguments in an attempt to secure his release. While admitting that LaForte spoke on July 22, 2020, to Undercover Agents about having "AR-15s", "shotguns" and "rifles" in his lake house, LaForte makes note that the "government omitted the parties' references to hunting." *See* Def.'s Mot. at 10 n.11. He also claims that the guns had never "been used in connection with a crime." *See Id.* at 12. These arguments completely miss the point because LaForte is a felon who cannot possess firearms in any context. He is charged with being a felon in possession of firearms. He is not charged with using the firearm. As a convicted felon, LaForte cannot legally hunt with firearms, he also cannot legally hold firearms, and he cannot legally constructively possess firearms in his lake house in the Middle District of Pennsylvania, in his mansion in the Eastern District of Pennsylvania, or anywhere else.

LaForte, while apparently admitting to knowing that the guns were in his own home also stated that the guns "were lawfully registered and safely secured in his childless home." *See* Def.'s Mot. at 12. This is not only factually inaccurate, but his admission of knowledge actually helps to prove the likelihood of his conviction. With the arguable exception of one pistol, the guns were not "safely secured." One loaded pistol was recovered from LaForte's unlocked desk drawer. Another two loaded pistols were recovered from LaForte's unlocked nightstand drawer. The AR-15 style rifle, which was loaded with a large capacity magazine, was recovered from the floor beneath the master bed. And two shotguns were recovered from cases in an unlocked closet. The guns were loaded, spread throughout the home, and in easily accessible places. The recoveries were so plain and apparent that any person residing in the home knew the guns were there and indeed LaForte appears to admit as much. LaForte is a felon who was knowingly in possession of firearms, and he is going to be convicted of that crime.

## V. LaForte Should Remain Detained Pending Trial.

The government moved for pretrial detention because the defendant is both a danger to the community and a flight risk. Judge Heffley, after reviewing the filings and arguments, clearly understood that reality and ordered him detained. In this case, the defendant possessed seven firearms and multiple rounds of ammunition despite being a convicted felon. As noted above, LaForte was in possession of a rifle that was loaded with a large capacity magazine as well as 6 other firearms, therefore under the United States Sentencing Guidelines he likely faces an advisory guideline range of 51 to 63 months imprisonment and a maximum of 10 years imprisonment upon his conviction. Furthermore, this is not the defendant's first brush with the law. The defendant has prior convictions, including a conviction from the United States District

Court for the District of New Jersey[3] and from the New York State Supreme Court.[4] As detailed above, the investigation of LaForte has also revealed that he has a history of making threats to others, and recently has said that he wants to move large sums of his money to offshore bank accounts. He is therefore a danger and flight risk. Finally, the government's evidence in this case is quite strong and includes, among other things, firearms recovered from the defendant's home in numerous places and recorded admissions by the defendant that he possesses and uses firearms.

While the defendant has community ties, which often benefit a chance for pretrial release, here these ties are troubling as they relate to Mr. LaForte's potential release plan. The defendant's relationships with his family members, friends, and his employment have not stopped him from engaging in crime. Indeed his family, friends and employment are the means through which he has engaged in criminal conduct, since as early as 2012, when he opened his business. The defendant remains the subject of an ongoing criminal investigation led by the FBI, and he and his company are the subjects of a separate civil lawsuit brought by the United States Securities and Exchange Commission (SEC). The defendant, as alleged in public filings in the SEC matter, engaged in a number of frauds in order to obtain large sums of money through

---

[3] In 2010, LaForte was sentenced in the United States District Court for the District of New Jersey for a conviction for conspiracy to operate an illegal gambling business in violation of 18 U.S.C. § 371 (conspiracy), a felony. He was sentenced to 10 months incarceration followed by three years supervised release.

[4] In 2004, LaForte was convicted of money laundering, grand larceny, conspiracy, and related offenses in Nassau County, New York. LaForte was sentenced to 3 1/2 to 10 1/2 years in prison and was obligated to pay a $14 million dollar restitution. It is believed that the restitution remains outstanding and unsatisfied.

his company.   The SEC matter also alleges that LaForte used aliases when conducting his business and failed to disclose to business investors and clients that he was a convicted felon. The extent of his wrongdoing through his business has already resulted in a temporary restraining order, seizure by the SEC of millions of dollars of likely ill-gotten monies, and the complete loss of control over his own business through a court-appointed receiver. This means that for the past several years, while attempting to appear as an honest business person, the defendant was engaged in a variety of forms of conduct, many of which are now being revealed, that have drastically altered the analysis of who Joe LaForte is.   The SEC filing thus far shows that LaForte uses aliases, lies to others, misrepresents who he is and what activities his business is engaged in, and alters and manipulates his business records as a means to fraudulently obtain monies.   This Court therefore cannot rely upon LaForte's claims about his alleged trustworthiness, community ties, or employment as a basis for a release plan.   Consequently, no condition or combination of conditions can assure this Court that he will not flee.

Also, the criminal investigation, and the separate SEC investigation, have resulted in the seizure of millions of dollars and substantial assets from the defendant.   The defendant, who had been used to a lifestyle of having several homes, multiple expensive cars, vast sums of money, a private jet and near limitless resources, now is a person facing not only loss of that entire lifestyle but of near certain conviction for an offense that will result in incarceration.   The defendant has a significant motivation therefore to flee if released as he knows that he stands to lose everything he believed he had prior to the search of his home.

This means that his ties to family, friends, employment and the community do nothing to ensure this Court that if released he will suddenly become a law abiding resident and will not

flee.   LaForte used his family ties and employment to commit fraud and wrongdoing, as evidenced by the SEC's public filings.   Similarly, those ties – his family, his friends, his assets, and his employment – did nothing to prevent him from possessing seven firearms and numerous rounds of ammunition.   His family and friends didn't prevent his crime here.   And the potential loss of assets and risk of re-incarceration didn't prevent his crime here.   His arguments that he will not flee or cause harm because of his family, his assets and employment ties are betrayed by the facts of this case.   LaForte had 2 loaded guns in his office desk, 2 loaded guns in his nightstand, 1 loaded gun beneath his bed, and 2 guns in the basement of his home despite (1) being a felon, (2) sharing his home with his wife, (3) having substantial assets, and (4) steady lucrative employment.   Those same connections cannot be a basis for releasing him now as they all failed him before.

   Moreover, Joseph LaForte is charged with being a felon in possession of a firearm, which is one important factor to consider in determining his dangerousness to the community. However, equally probative of his dangerousness to the community is the fact that the Defendant has an extensive history of criminal activity and has shown, though the undercover recording described above, his willingness to not only possess firearms, but to transport them to other judicial district, brag about his stockpile of guns, and enjoys their use. LaForte's brazen statements to the Undercovers, as well as his apparent prior practice of keeping guns littered throughout his home, clearly show his unwillingness to follow court imposed restrictions, lead a law abiding life, and refrain from possessing and using firearms.   LaForte by his words and actions has revealed that he is a danger to the community.

Therefore, taking a complete view of the defendant, his case, his history, and his community ties, Joseph LaForte must remain detained pending trial.

**VI.      Conclusion.**

When all these factors are viewed in light of the substantial sentence the defendant faces if convicted, it is clear that no condition or combination of conditions will reasonably assure the presence of the defendant as required and/or the safety of the community.

WHEREFORE, the government respectfully submits that the defendant's motion for release from pretrial custody be denied.

                                              Respectfully submitted,

                                              WILLIAM M. MCSWAIN
                                              United States Attorney

                                              /s    Jonathan B. Ortiz
                                              JONATHAN B. ORTIZ
                                              PATRICK J. MURRAY
                                              Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the Government's Response in Opposition to Defendant's Motion for Pretrial Release, was served by electronic mail upon the following counsel of record for Joseph LaForte:

    Brian J. McMonagle, Esq.
    McMonagle Perri McHugh & Mischak
    1845 Walnut Street, 19th Fl.
    Philadelphia, PA 19103

    Michael J. Engle, Esq.
    Buchanan Ingersoll & Rooney PC
    Two Liberty Place
    50 S. 16th Street, Suite 3200
    Philadelphia, PA 19102-2555

    James R. Froccaro, Jr., Esq.
    20 Vanderventer Avenue, Suite 103W
    Port Washington, NY 11050


                                              /s Jonathan B. Ortiz
                                              JONATHAN B. ORTIZ
                                              Assistant United States Attorney

Dated: August 27, 2020