IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA         :

             v.                        :          CRIMINAL NO. 20-231

JOSEPH LAFORTE                   :

### DEFENDANT JOSEPH LAFORTE'S REPLY IN SUPPORT OF HIS MOTION FOR PRETRIAL RELEASE

The government's August 27 submission is most significant for what it omits: the memorandum fails to point to *a single case* in which a defendant comparable to Mr. LaForte – a well-grounded member of the community with no history of violence – has been denied release. Given the high stakes, detaining Mr. LaForte would deprive him of "the most elemental of [our constitutional] liberty interests," *United States v. Abuhamra*, 389 F.3d 309, 318 (2d Cir. 2004), one would expect the prosecutors to have strong authorities supporting their position. Instead of authorities, they have presented this Court with a motley collection of contradictory claims regarding Mr. LaForte's finances and unproved allegations lifted from civil suits.

The legal framework is, at least, clear. In order to win Mr. LaForte's detention, the government must first prove "[a] a likelihood of flight, [b] a threatened obstruction of justice or [c] a danger of recidivism in one or more of the crimes actually specified by the bail statute." *United States v. Himler*, 797 F.2d 156, 160 (3d Cir. 1986). If it succeeds in establishing a risk of flight, obstruction or recidivisms, the government must then convince the Court, at a hearing, "'that no condition or combination of conditions will

reasonably assure the appearance of the person as required and the safety of any other person and the community.'" *United States v. Salerno*, 481 U.S. 739, 742 (1987) (quoting 18 U.S.C. § 3142(e)). By any reckoning, the government has fallen well short of making either of the required showings here.

## ARGUMENT

## I.   THE RISK OF FLIGHT IS SLIM TO NON-EXISTENT

The government's principal argument is a flailing attempt to paint Mr. LaForte as a flight risk. Despite soaring rhetoric, its claims – which are predicated on a few minutes of banter at a dinner that lasted nearly four hours – never leave the ground. The attached transcript, a rough draft of the relevant dialogue from the July 22 dinner recording, demonstrates that it was the FBI's "undercover employees" – *and not Mr. LaForte* – who raised the subject of "Nevis" and expressed "great interest" in flying cash to that Caribbean Island. Gov't Reply at 7. Mr. LaForte's response was jovial, polite and dismissive.[1]

The reality is that it would not matter for present purposes even if the government *could*, somehow, establish that Mr. LaForte – a man who *does not even hold a passport* – harbored "a genuine interest in, and plan to, move bulk amounts of money to

---

[1]   Notwithstanding the government's burden on the issue of flight, the defense has prepared clips of the relevant portion of the July 22 recording for the Court's review. The clips have also been made available to the government.

2

Nevis." *Id.* The fact – which the government has tacitly conceded[2] – is that Mr. LaForte

does not have financial resources, let alone personal or familial connections, outside of

the United States. As the government explained to Judge Heffley, asset freezes imposed

as a result of the SEC's civil suit make clear that he does not "have the means to [flee]"

even if he were so inclined. 8/11/2020 Tr. at 18. The government argued:

> It bears noting that . . . the government seized [Mr. LaForte's]
> airplane, so he [can]not use it. They also – we also seized a 10 million
> dollar account that belonged to him and his wife, [so] that he did not
> have access to that. The other remaining account that he received
> monies from . . . were frozen by the SEC.

*Id.*

This is plainly not a case where "overseas assets contribute to flight risk." *United*

*States v. Choudhry*, 941 F. Supp. 2d 347, 357 (E.D.N.Y. 2013) (citing *United States v.*

*Sabhnani*, 493 F.3d 63, 77 (2d Cir. 2007)). The government's speculations concerning

Mr. LaForte's "plan[s]" (Gov't Reply at 7) are both incredible and irrelevant.

Mr. LaForte's behavior in the 10 days that elapsed between the search of his houses on

July 28 and his arrest on August 7 is the best – and only – evidence that speaks to his

"motivation and intent to flee." Gov't Reply at 7. High-flying claims notwithstanding,

---

[2]     Before Judge Heffley, the government made the preposterous representation
that it "d[id] not yet know if [Mr. LaForte] succeeded in [his supposed] efforts of hiding
his riches [in Nevis]." Gov't Mem. at 10.  Private jet or not, the government could easily
ascertain whether Mr. LaForte left the country – or even applied for a passport – during
the time between his dinner with the undercover employees on July 22 and his arrest
on August 7. Evidently, he did not.

Mr. LaForte hired counsel and prepared to fight the government, both in this matter and the SEC litigation in Florida.[3]

## II.   THE GOVERNMENT DOES NOT SERIOUSLY CONTEND THAT MR. LAFORTE IS A DANGER TO ANYONE IN THE COMMUNITY

While the July 22, 2020, recording provides scant evidence of flight risk, it provides a clear indication of Mr. LaForte's views on the use of threats to cajole merchants into honoring their financial obligations.[4] Such practices, Mr. LaForte candidly opined, were "criminal" "outliers" deserving of "righteous" prosecution by regulatory authorities. *See* 8/25/2020 Mem. at 9-10. The government's latest submission

---

[3]      In its latest submission, the government references the SEC's claim – made in the context of its civil suit – that Mr. LaForte "used aliases when conducting his business." Gov't Reply at 13. That claim is easily rebuttable. For one thing, Mr. LaForte used his name in his interactions with the FBI's undercover employees. Furthermore, news articles openly connect Mr. LaForte, who is identified by name, to his company. *See, e.g., Joseph Leforte Shares What the Biggest Obstacles for Money-Savvy Millennials,* Foreign Policy (March 7, 2019), https://foreignpolicyi.org/joseph-laforte-shares-what-the-biggest-obstacles-for-money-savvy-millennials/. Finally, the government *cannot* deny that no investor ever lost his or her investment in Mr. LaForte's company – nor has a dollar of investor money been misappropriated – since it opened nearly a decade ago.

[4]      The government's reliance upon the alleged threats – which are presented as a sort of general indication of dangerousness, *see* Gov't Reply 8 (arguing that the allegations "demonstrate[ Mr. LaForte's] dangerousness and now [ ] should point this Court towards detention") – is patently inappropriate. As noted above, the government may seek detention "only" upon proof establishing a risk of flight, a danger of obstruction or a likelihood of "recidivism in one or more [specified] crimes." *Himler*, 797 F.2d at 160. Evidence that Mr. LaForte or his company resorted to threatening delinquent merchants – even if it were credible – would not fall into any of these three categories.

provides no basis to doubt the sincerity of these freely-expressed and secretly-recorded statements.

The disgruntled merchants referenced in the government's submission, on the other hand, had every reason to fabricate claims of wrongdoing against Mr. LaForte and his company. The so-called "witnesses" (Gov't Reply 8) – even the government declines to refer to them as alleged victims – have two things in common. First, they are merchants who faced legal action after defaulting on financial obligations to Mr. LaForte's company. Second, they are represented by a single attorney with a questionable past. These circumstances cast substantial doubts upon the credibility of the merchants' accusations.

The government makes no effort to vindicate the credibility of the merchant-accusers. There is good reason to suspect the futility of any such effort: local investigations into the alleged threats have concluded that the accusations are unfounded.[5]

Despite the "long-term" investigation of Mr. LaForte's business practices (Gov't Reply 1), the only charge before this Court relates to his wife's guns, purchased after she was the victim of an armed robbery. The government has failed to produce "clear and convincing evidence" of a danger to the community, *Salerno*, 781 U.S. at 741, much

---

[5]     The fact that Mr. LaForte has not been charged with extortion despite a "long-term" investigation into his business practices (Gov't Mem. at 2), suggests that the government itself places little credence in the so-called "witnesses'" accounts.

less one that cannot be mitigated through the very substantial and restrictive bail package that Mr. LaForte has proposed here.

## CONCLUSION

Mr. LaForte is a Pennsylvania resident with no history of violence or ties to a foreign jurisdiction. His flight from prosecution would not only be uncharacteristic – he has never before failed to comply with a court-imposed restriction[6] – it would be personally disastrous: he would lose the only home he knows, impoverish the family and friends who have volunteered to post their properties as security for his bond and forfeit his personal wealth to the SEC in the Southern District of Florida civil suit. Under these circumstances, granting the government's bid for pretrial detention would constitute a gross deviation from precedent and a repudiation of the constitutional "proscription against punitive detention before trial." *Abuhamra*, 389 F.3d at 319.

---

[6]    Contrary to the government's belief (*see* Gov't Mem. at fn.4), Mr. LaForte has satisfied the financial obligations imposed upon him as a result of his 2004 conviction in New York State.

For the reasons set forth here and in his previous submission, the defense respectfully requests that this Court, in accordance with the recommendation of Pretrial Services, grant Mr. LaForte's application for pretrial release.

Dated:  Philadelphia, Pennsylvania
       September 2, 2020

<div style="margin-left:40%">

Respectfully submitted,

s/JAMES R. FROCCARO, JR.
JAMES R. FROCCARO, JR.
20 Vanderventer Avenue, Suite 103W
Port Washington, NY 11050
(516) 944-5062 (phone)
(516) 944-5066 (fax)
jrfesq61@aol.com

BRIAN J. MCMONAGLE
MCMONAGLE PERRI MCHUGH &
MISCHAK
1845 Walnut Street, 19th Fl.
Philadelphia, Pa. 19103
(215) 981-0999
bmcmonagle@mpmpc.com

MICHAEL J. ENGLE
BUCHANAN INGERSOLL ROONEY
50 S. 15th Street, Ste. 3200
Philadelphia, Pa 19102
(212) 665-5308
Michael.engle@bipc.com


*Attorneys for Defendant Joseph LaForte*

</div>

**Transcript of Excerpts From the July 22, 2020 Recording**

1:14:00

**Note: parties discuss the concept of "glamping."**

LAFORTE: You know how it came up? I didn't know what it was either. My wife wanted to go to Amangani, not Amangiri.

UCE 1: Oh yea.

LAFORTE: Amangiri is by you?

UCE 1: No. Amangiri is in Utah.

ABBONIZIO: No, Amangiri is the one you you stayed at in Utah.

UCE 1: In Utah . . .

LAFORTE: Alright, not that one . . .

UCE 1: It's Amazing.

**Note: discussion moves to "Aman" hotel\resort chain**

. . .

LAFORTE: Since those Kardashian girls put that place on the map, you can't get in. They got an attitude. You call. You try to make a reservation [UI].

UCE 1: All the "Amans" are good. I went to one in Turkey . . .

ABBONIZIO: Yea?

UCE 1: I forget what it's called, Aman-something.

ABBONIZIO: You were in Turkey?

UCE 1: Yea, went to Turkey once.

LAFORTE: Really?

UCE 1: [UI]

ABBONIZIO: Did you really?

UCE 1: Why? What's wrong with me?

LAFORTE: That's awesome. . .

ABBONIZIO: No, I . . .

UCE 2: World traveler.

ABBONIZIO: It's fabulous.

UCE 1: Thank you.

UCE 2: I can already tell it's good.

LAFORTE: You guys travel a lot out of the country?

UCE 1: Well, we have a lot of. We've, we've done a lot of travel; in the Caribbean, right? Nevis. We travel a lot, not together . . . sometimes together . . .

UCE 2: Not always together.

UCE 1: Not always together, but sometimes together.

ABBONIZIO: So what's in the Caribbean guys?

UCE 1: Nevis.

UCE 2: Nevis, specifically. Is uh, a great place to put money.

ABBONIZIO: Yeah it is. You a fly fishing?

UCE 2: A great place to put money I'm . . .

LAFORTE: When we going?

UCE 2: I'm telling you. That is probably one of the most unique places. I've ever seen.

AGENT NOTE: UCE 1 and UCE 2 discuss buying a corporate retreat. Discuss a realtor saying "You have to buy it, you have to buy it."

LAFORTE: UI.

LAFORTE: I'm in by the way.   Let's go.

UCE 2: And you get citizenship there when you buy a place over a certain amount of money. You get citizenship.

UCE 1: You get citizenship.

LAFORTE: I know. I know about this. I know about this.

UCE 2: You get citizenship and it gets you so much.

LAFORTE: But you gotta spend.

UCE 1: But you can get a scam condo there for 300 grand.

LAFORTE: Yeah, but you want to go bigger because you want to get nexus.

UCE 1: Well, yeah. Well.

UCE 2: But the place she likes was like 1.1 or 1.2?

UCE 1: The one I wanted? No, that was over two.   UCE 2: It was 2-4.

UCE 1: But it wasn't a bad price.

AGENT NOTE: Parties go on to discuss this purported real estate purchase.


1:17:07

ABBONIZIO: So go back to this. Once you buy the property, you get citizenship.

AGENT NOTE: UCE 1 says that if you buy a property over a certain amount you get economic citizenship.

2

ABBONIZIO: Well, that's all you need.

UCE 2: And you get protection from the Nevisian government.

ABBONIZIO: (grunts)

AGENT NOTE:   Sounds like LAFORTE says "Oh" or "wow."

UCE 1: So we've done. We have a contact down there. Like I said, half of our assets are oversees. They're mostly there.

ABBONIZIO: I have a very wealthy buddy. He does the same – similar thing.

UCE 1: Bank of Nevis.

ABBONIZIO: He goes there six or seven times a year, I finally said to him: "What's the attraction." He said, "I do a little fly fishing." I said, "You're not a fly fisher." He said, well I do (UI)


**1:37:55**

LAFORTE: When are we flying down to Nevis?

UCE 1: When would you like to? So, I do not recommend August/September. . . .

AGENT NOTE: Parties discuss good months to travel to Nevis.

LAFORTE: Well if we go down to and buy a place, how fast can we get in front of a bank?

UCE 1: That day.

UCE 2: That day.

UCE 1: Seriously, yeah.

LAFORTE: Okay.

UCE 1: So, we've gone down there a few times when we started our LLCs down there.

LAFORTE: And they accept cash there?

UCE 1: Absolutely.

ABBONIZIO: Yeah, he brought cash, my buddy.

UCE 1: So here's what you do.

UCE 2: The beauty of a private plane.

UCE 1: You take a plane. No checked bags.

LAFORTE: Oh yeah.

UCE 1: Bring bags.

LAFORTE: Oh yeah.

ABBONZIO: This has been a very good dinner.

UCE 1: Bring bags. All set.

LAFORTE: UI

UCE 1: All set.

ABBONIZIO: Where's Joe this weekend? I don't know he went fishing down at Nevis.

UCE 2: What's Nevis?

LAFORTE: You're crazy. I've never heard of the place.

## CERTIFICATE OF SERVICE

BRIAN J. MCMONAGLE, ESQUIRE, hereby certifies that on the date set forth below a true and

correct copy of the Defendant's REPLY IN SUPPORT OF HIS MOTION FOR PRETRIAL RELEASE has been

served by electronic filing.

s/ BRIAN J. MCMONAGLE
BRIAN J. MCMONAGLE, ESQUIRE
MCMONAGLE, PERRI, MCHUGH, MISCHAK & DAVIS
1845 WALNUT STREET, 19TH FL
PHILADELPHIA, PA 19103
(215) 981-0999, FAX (215) 981-0977

DATED:  9/3/2020